STATE OF MAINE                          SUPERIOR COURT
LINCOLN, ss.                            CIVIL ACTION
                                        DOCKET NO.: WISSC-CV-18-24

GREGORY LAWSON and          )
ANGELA LAWSON,              )
                            )
        Plaintiffs,         )
                            )        **ORDER ON DEFENDANTS'**
    v.                      )        **MOTION FOR SUMMARY**
                            )        **JUDGMENT**
ROBERT MORSE, JR. and       )
ATLANTIC LABORATORIES, INC.,)
                            )
        Defendants.         )

This matter is before the court on the Defendants' Motion for Summary Judgment.

## BACKGROUND

The following facts are undisputed unless otherwise noted. On December 15, 2015, Gregory Lawson, a commercial seaweed harvester, and his wife, Angela Lawson (collectively Plaintiffs), visited Gregory Morse in his office at Atlantic Laboratories, Inc. (ALI) (collectively Defendants). Defendants' Statement of Material Facts (DSMF) ¶¶ 1-2, 6. ALI is a seaweed processor that buys harvested seaweed from independent contractors. DSMF ¶ 3. ALI was familiar with Gregory as he had previously used another independent contractor's boat to harvest seaweed which was sold to ALI. DSMF ¶ 3. The parties discussed an arrangement (the Agreement) where ALI, or Morse,[1] would pay for the construction of a seaweed harvesting boat (Vessel) at their plant. DSMF ¶ 6. The Plaintiffs, or their business, Perry's Pride II & Son, LTD (Perry's Pride) would use the Vessel to harvest all the seaweed they could, and the value of one-third of each harvest would go towards the Vessel's construction costs, in anticipation of the Plaintiffs eventual

---

[1] The parties never discussed whether the Plaintiffs were contracting with Morse, ALI, or both.

1

ownership of it. DSMF ¶ 6. Gregory was to facilitate the building of the Vessel, and then later use it to harvest seaweed.[2] DSMF ¶ 8.

Once the total construction cost of the Vessel was paid off through the one-third value of each of Gregory's seaweed harvests that he sold to ALI, including three percent interest, the Vessel would become the Plaintiffs' property. DSMF ¶¶ 6, 10, Plaintiffs' Response to ¶ 6.[3] Gregory, using subcontractors when needed, worked for four months at ALI's plant to build the Vessel. DSMF ¶¶ 16, 18. ALI purchased the hull and all the materials necessary for its construction, paid the subcontractors, and owned the Vessel once construction was complete. DSMF ¶¶ 14-15. ALI paid Gregory $15.00 per hour for his labor on the Vessel, and he is not claiming that he is owed any additional money based on his labor. DSMF ¶¶ 17-18. Angela voluntarily assisted with the Vessel's construction and was not paid. DSMF ¶ 19. The Vessel was finished on April 30, 2016. DSMF ¶ 20.

Gregory used the Vessel to harvest seaweed from May 2, 2016 through July 25, 2016. DSMF ¶ 13. Because of an intense disagreement between Gregory and Morse about where to harvest seaweed, Gregory stopped harvesting after July 25, and therefore did not pay the amount due for the Vessel under the Agreement. DSMF ¶¶ 22, 52, Pl.'s Response ¶ 22. Gregory did not speak with Morse again after this argument. DSMF ¶ 49. Up to that point, the Plaintiffs had provided 60,000 pounds of seaweed to ALI. DSMF ¶ 44. After the argument, the Plaintiffs asked Morse for a lump sum payoff price for the Vessel, but he never provided it. Pl.'s Response ¶ 22. Sometime in August, Gregory called ALI and told the business that he needed the Vessel taken out of the water to change its

---

[2] There is no written agreement. The verbal transactions are the sum of the parties' contract. DSMF ¶¶ 23-25.

[3] One-third of the value of each harvest was to be set aside for fuel, future repairs, and maintenance of the Vessel, and the remaining one-third was to be paid to Plaintiffs. DSMF ¶¶ 11.

2

oil, in anticipation of resuming harvesting. Pl.'s Resp. ¶ 22. On August 16, 2016, an ALI employee took the Vessel out of the water, and after doing so, told the Plaintiffs that Morse wanted the Vessel back, and took it with him. Pl.'s Resp. ¶ 22.

The Plaintiffs sued Morse individually because he is an employee of ALI, and they assume he is its owner, but they do not actually know if ALI or Morse is the proper Defendant. DSMF ¶ 56. All of the documentation that came about as a result of the Agreement shows that the seaweed was purchased solely by ALI, ALI purchased the hull to the Vessel, and it is registered to ALI alone. DSMF ¶ 57. Morse does not appear on any of the documentation in his individual capacity. The rest of the DSMFs allege that there were missing terms in the Agreement, such as an amount of seaweed necessary to repay the loan, quotas, price terms, and whether the loan was to be repaid by seaweed or check. *See* DSMF ¶¶ 26-36. The Plaintiffs dispute some of these facts, but as discussed below, these facts are not material. Plaintiffs agree there was no weekly quota, and that Gregory set the price for the seaweed.

The Plaintiffs filed their three-count complaint on July 6, 2018, alleging breach of contract, fraudulent misrepresentation, and conversion. After the Plaintiffs agreed to dismiss their conversion claim, the Defendants moved for summary judgment on May 2, 2019. The Plaintiffs timely responded, but did not strictly comply with M.R. Civ. P. 56. The Defendants contend that they are entitled to summary judgment based on that procedural defect, but also on the merits of the Plaintiffs' claims. They additionally maintain that Morse is individually entitled to summary judgment.

## DISCUSSION

Summary judgment is appropriate if, reviewing the evidence in the statements of fact and record references in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter

3

of law. M.R. Civ. P. 56(a), (c); *Platz Assocs. v. Finley*, 2009 ME 55, ¶ 10, 973 A.2d 743. A fact is material if "it has the potential to affect the outcome of the suit." *Id.* "A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Id.* To withstand a motion for summary judgment, the non-moving party must present sufficient admissible evidence to establish a prima facie case for each element of the claim or defense. *Watt v. UniFirst Corp.*, 2009 ME. 47, ¶ 21, 969 A.2d 897. "If a plaintiff presents insufficient evidence on an essential element of a cause of action, such that the defendant would be entitled to judgment as a matter of law on that state of the evidence at a trial, the defendant is entitled to a summary judgment." *Estate of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 13, 157 A.3d 769.

## I.    Summary Judgment on the Merits

The Defendants first argue that they are entitled to summary judgment on the breach of contract claim because the Agreement lacked a determinate term, and therefore was terminable at will by either party. They allege that the Agreement was terminated when Gregory stopped harvesting seaweed in late July through early August after the heated disagreement with Morse, or alternatively, when the Defendants took the Vessel. They further argue that even if the Agreement was not terminable at will, that the Agreement is not a binding contract because of the absence of material, essential terms necessary to make it binding and enforceable, or to allow the court to allocate liabilities to the parties. As to the Plaintiffs' fraudulent misrepresentation claim, the Defendants mainly contend that summary judgment is warranted because the Lawsons do not establish a prima facie case of all the required elements, namely that they do not show

4

that the Defendants' statements were knowingly false when made.[4] Finally, they argue that the Plaintiffs have failed to establish a prima facie case for individual liability against Morse because they have not shown that he was a party to the agreement, and therefore summary judgment should be entered for him individually on both counts.

**A. Count I: Breach of Contract**

For an agreement to be binding under Maine law, it must be "sufficiently definite" to allow a court to determine its meaning and to assign the legal liabilities of the parties. *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 18, 983 A.2d 382. Indefiniteness may relate to miscellaneous or key terms of the agreement, including price, timing of performance, or the exact work to be completed. *Id.* ¶ 19. But, even if a contract is lacking an essential term, courts will supply the necessary term using the standard of reasonableness. *Id.* Sometimes, however, missing or indefinite terms "preclude a reasonably calculable remedy or indicate a lack of contractual intent so as to render an agreement unenforceable. . . ." *Id.* The *Fitzgerald* Court cited to *Towne v. Larson*, which observed that courts should be "reluctant to construe a contract so as to render it unenforceable if that result can be avoided." 142 Me. 301, 305, 51 A.2d 51, 53 (1947). Finally, "[u]nder Maine law, 'a reservation to either party of an *unlimited* right to determine the nature and extent

---

[4] In their initial Motion for Summary Judgment, the Defendants argued, based on *Shine v. Dodge*, 157 A. 318, 319 (Me. 1931) that fraudulent misrepresentation cannot be maintained for claims that are based on promises of future performance, regardless of whether there was a preconceived intent not to perform. Def.'s Mot. 17-19. Subsequently, the Law Court decided *Cianchette v. Cianchette*, 2019 ME 87, ___ A.3d ___. There, the Court overruled *Shine* and adopted the broad rule set forth in the Restatement (Second) of Torts § 525. *Id.* ¶ 23. Now, "[a] representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." *Id.* ¶ 24 (quoting Restatement (Second) of Torts § 530(1) (Am. Law Inst. 1977)). However, the Court made clear that "the intent to not perform must be present *at the time* the parties are entering into the contract." *Id.* ¶ 26. Therefore, if the person making the representation changes his mind or fails to perform "at some point *after* the contract is entered into, then the appropriate remedy lies solely in an action for breach of contract." *Id.* The Defendants maintain their argument, as they allege that their intent to not perform under the Agreement did not occur until after the heated disagreement between Gregory and Morse.

5

of his performance renders his obligation too indefinite for legal enforcement, making it, as it is termed, merely illusory.'" *Millien v. Colby Coll.*, 2005 ME 66, ¶ 9, 874 A.2d 397 (quoting *Corthell v. Summit Thread Co.*, 132 Me. 94, 99, 167 A. 79, 81 (1933)).

### i.    Is the Agreement Unenforceable for Lack of Material Terms?

The Defendants argue that the Agreement is unenforceable because "essential, material terms, such as price, quantity, location, and payment, were never concluded, making it impossible for the court to fix any legal liabilities of the parties."

The court is not convinced by the caselaw that the Defendants cite. First, *Millien* involved a student handbook with a reservation clause that expressly gave the college "the right to unilaterally alter the terms of the handbook without notice to the students." 2005 ME 66, ¶ 3, 874 A.2d 397. All the cases that cite to *Millien* for the proposition put forth by the Defendants involve detailed, written contracts that contained explicit reservation clauses. None involve the present circumstances of this case: a handshake deal, where at the time the agreement was made, nothing was stated about whether a party could change the Agreement's terms unilaterally. The Defendants' SMFs focus on the facts that there was no obligation to provide a minimum amount of seaweed, whether it was to be weekly or monthly, or if the Plaintiffs had to harvest any seaweed at all. ¶¶ 29-34. However, after a review of the deposition testimony, in the light most favorable to the Plaintiffs, the court does not come to the same conclusion.

First, in their response to the Defendants' SMFs, the Plaintiffs state that "a very specific quantity of seaweed" was necessary under the Agreement, essentially however much it took to pay off the amount due on the Vessel after its construction: $127,721. However, they do admit that there was no discussion or agreement on the volume of seaweed to sell to ALI, whether weekly or monthly. DSMF ¶ 31. The Plaintiffs' deposition testimony reflects the inherent uncertainties in taking a boat out onto the ocean to harvest

seaweed. These uncertainties include the weather, boat breakdowns, poor harvesting at a location, and potential injuries to the boat operator. If any of these incidences occurred, it might mean that the Plaintiffs could not deliver a specific amount of seaweed every week, or every month. The court notes that these are common issues within the fishing industry. Moreover, the Agreement was clear that the Plaintiffs were to provide the Defendants with all the seaweed they harvested, and that they would harvest as much seaweed as they could. Because there was no explicit reservation clause in the Agreement, and the Plaintiffs have shown that a certain amount of seaweed was necessary under the agreement as a whole, the court determines that the quantity term of the Agreement was sufficiently definite to amount to an enforceable contract.

The Defendants next contend that the price of the seaweed and the repayment terms are not sufficiently definite to allow the court to enforce this Agreement.[5] First, the repayment terms are sufficiently definite. Although the harvests were not on a specific weekly or monthly schedule, how the income from them was to be allocated is clear. The price of each seaweed harvest is less clear. According to the Defendants' SMF, "[t]he price of any seaweed harvested would be whatever Morse set as a price for ALI." ¶ 38. The

---

[5] The court disagrees that other terms not discussed in the Agreement are material. Their omission does not cause the Agreement to be insufficiently definite. The Defendants claim that the parties were not sufficiently definite because some of the seaweed harvests were sold to them from the Plaintiffs as individuals and some from the Plaintiffs as Perry's Pride. So long as the Defendants were getting seaweed from the Plaintiffs in some capacity, this is term immaterial. Likewise, whether the Defendants were paid in seaweed or cash is immaterial as, regardless, three percent interest was still accruing on the amount due. Lastly, the location of harvesting is also not material. So long as the Defendants were receiving an acceptable amount of seaweed, it is immaterial where it was harvested from. The Defendants have not alleged that there is a difference in the quality or value of seaweed harvested from different locations. Because the heart of the Agreement was to exchange seaweed for payment towards the Vessel, a lack of discussion about the aforementioned terms does not render it unenforceable or insufficiently definite.

Plaintiffs agreed with this fact, but qualified it by explaining that "this was the price offered to others."

The Defendants cite to cases in which no enforceable contract was created because the discretion regarding the amount to pay was left entirely to one party's judgment. *See Bragdon v. Shapiro*, 146 Me. 83, 88, 77 A.2d 598, 601 (1951) (when a bonus is given "if business warranted" was not an enforceable contract because the terms were too indefinite and meaningless, leaving no sufficiently certain standard to "guide the factfinder in determination of what the bonus should be. Too much is left to the judgment of the employer."); *Anderson Mem'l Hosp. v. Hagen*, 313 S.C. 497, 498, 443 S.E.2d 399, 400 (Ct. App. 1994) (a widower's promise to pay the hospital that treated his wife before her death "what he can" did not amount to a meeting of the minds as to the contract price, and such a promise "is not sufficiently certain to bind the promisor contractually. Too much is left to the judgment of the promisor.")

The final case that the Defendants cite involves an conversation between a Department of Human Services Employee and a plaintiff that she told "would be eligible for adoption assistance 'at the going rate.'" *Cote v. Dep't of Human Servs.*, 2003 ME 146, ¶ 2, 837 A.2d 140. After the conversation, the woman signed a written contract for adoption assistance. *Id.* The Law Court determined that the plaintiff did not show facts supporting a prima facie case of breach of contract. *Id.* ¶ 3. The Court continued, however, that even if it were to accept the plaintiff's premise that "'the going rate' is different from what she ultimately received, this remark does not sufficiently enable the court to determine the liabilities of the parties, and therefore did not create an oral contract. [Plaintiff's] attempt to weave a single remark into a contract is without merit." *Id.*

The case at bar is different than those that the Defendants cite. To be sure, there was some discretion on the Plaintiffs' part regarding what to charge for the seaweed, but

8

it was not unbridled discretion as it was seemingly within industry standards. The instant case is also distinguished from *Cote*, as the "going rate" for adoption contracts is unlikely to be subject to the trade and industry standards that are present in seaweed harvesting. Moreover, in *Cote*, the plaintiff was attempting to "weave a single remark into a contract," *id.*, whereas here, much discussion was had at the December 15, 2015, meeting to create the Agreement, including the construction of the Vessel, how it was to be paid for, and how the Vessel was to be maintained. This is not an attempt by the Plaintiffs to weave an isolated statement into an enforceable contract.

The price of the seaweed harvest is a key term left open by the contract which this court may supply by invoking the law of reasonableness. *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 19, 983 A.2d 382. The *Fitzgerald* Court determined that when the parties had previously worked together, an unstated percentage of commission did not render the parties' contract unenforceable. *Id.* In coming to its conclusion, it cited to the Restatement (Second) of Contracts § 33 cmt. a: "[a]n offer which appears to be indefinite may be given precision by usage of trade or course of dealing between the parties." *Id.* Further, *Fitzgerald* cited to another case "observing that courts should be reluctant to construe a contract so as to render it unenforceable if that result can be avoided.'" *Id.* (quoting *Towne v. Larson*, 142 Me. 301, 305, 51 A.2d 51, 53 (1947). Here, although the parties had not directly worked together in the past, the record supports that Morse was aware of Gregory's work history. Both parties are intimately familiar with the seaweed harvesting industry. Therefore, the court determines that the Agreement was not insufficiently definite for lack of a price term because the parties had worked together in the past, albeit indirectly, and industry standards and customs could be referenced by this court to supply a price term. The Agreement is not unenforceable for lack of material terms, and it is not merely illusory.

9

### ii. Was the Agreement an Oral Contract With an Indefinite Term that was Terminable at Will?

The Defendants argue that the Agreement was for an indeterminate term generally because it had no specific end date. They maintain that because it had no definite term it was therefore terminable at will. It supports its position with two cases, neither of which address the specific circumstances present in this case. In response, the Plaintiffs contend that although there was no specific date on the calendar at which the Agreement was to end, it had a definite term because the Agreement would conclude on the date they paid off the $127,721, plus three percent interest.

The Defendants first cite to *Roger Edwards, LLC v. Fiddes & Son, Ltd.*, 245 F. Supp. 2d 251, (D. Me. 2003) for the proposition that an oral contract without a definite term is terminable at will. There, in an agreement regarding the marketing and distribution of the defendant's products, there was no "specific termination date and [it] was not for a specific duration." *Id.* at 255. Instead, it was the plaintiff's understanding that the "parties expected to continue to do business indefinitely as long as they complied with the spirit of the agreement and sales volume grew to their satisfaction." *Id.* Notably, the *Roger Edwards* court cited to *Bangor & A. R. Co. v. Daigle*, 607 A.2d 533, 535 (Me. 1992) to explain that generally "courts will not interpret contracts as being of infinite duration unless the agreement expressly states that is the intention of the parties." *Id.* at 262. In the case before this court, neither party intended their Agreement to go indefinitely. The Agreement was to continue until the sum of money that the Defendants put into the Vessel was paid in full, but not longer than that.

Next, the Defendants cite to *Burnell v. Town of Kingfield*, 686 A.2d 1072 (Me. 1996), which specifically discussed employment contracts. There, the Law Court concluded that the Defendant "was entitled to a judgment as a matter of law because a promise to

10

provide [the plaintiff] with 20.5 hours of work per week until [a third party employee] retired was not legally sufficient to create an employment contract for a definite term." *Id.* at 1073. It distinguished the case before it from *Terrio v. Millinocket Community Hospital*, where there was a definite term for employment when the employee showed the employer's personnel policy and retirement plan setting the age for retirement at 65, combined with her employer's statements that she would have her job for the rest of her life. 379 A.2d 135, 137-38 (Me. 1977). The *Burnell* court distinguished the case before it by explaining that:

> [u]nlike the circumstances present in *Terrio* the parties' agreement in the instant case did not provide that [the plaintiff's] employment would be terminable at a specific date or that she would be employed for a <u>determinate, measurable period of time</u>. Although [the third party employee's] retirement was likely to occur at some future time, the date was unknown. The duration of an employment contract is definite if it is for a fixed period of time capable of measurement.

*Burnell*, 686 A.2d at 1074 (emphasis added).[6] In the case before this court, it is not an employment contract at issue. Instead, it is an Agreement to pay for the Vessel via portions of seaweed harvests, until the amount due was paid in full. The period of time that the Agreement was to last for was determined and could be measured, in the sense that it was to last only as long as payments were owed. This case is more like *Terrio*, where surrounding circumstances support the contract being of a definite term, not an indeterminate one.

---

[6] The Court went further and stated that the parties didn't even actually consider the third party employee's retirement as an end date for the plaintiff's employment, "rather, according to [the plaintiff's] deposition testimony, she understood that she was training to take over [the third party employee's] position and *would continue working indefinitely* after [that employee] retired." *Burnell v. Town of Kingfield*, 686 A.2d 1072, 1074 (Me. 1996) (emphasis added). This distinguishes *Burnell* further from the present case. Here, neither party believed that payments would indefinitely continue once the amount due on the Vessel, including interest, was paid in full.

11

The Plaintiffs cite to *McSorley v. Inhabitants of Carmel*, in which the Superior Court (Penobscot County, *Marsano, J.*) had to determine whether a town's motion to keep an employee "through the hiring process" of another person amounted to a contract for an indefinite, or a definite, term. No. CV-2000-17, 2001 Me. Super. LEXIS 178. At *14-15 (May 30, 2001). In its analysis, the court quoted *H.L. Miller Machine Tools, Inc. v. Acroloc Inc.*, 679 F. Supp. 823, 825 (C.D. Ill. 1988), to explain that "[a] duration term need not specify a date or period of time; it can identify some event which will signal termination, even if it is not clear, ex ante, when that event will take place." *McSorley*, 2001 Me. Super. LEXIS 178 at *15. The court concluded that because the employee's contract had expired and was not renewed, that the town's vote to keep her on "through the hiring process" of another town employee was "an ascertainable identifiable event" and amounted to a contract for a definite term as a matter of law. *Id.* at *15-16.

Here, despite the Defendants' contentions otherwise,[7] the Agreement was not intended to go on indefinitely. Instead, it was to conclude upon the Plaintiffs' payment of the amount owed, which was a definitive event that would end the Agreement. This court holds, that as a matter of law, the contract was for a definite term. Therefore, it was not terminable at will. Because the Plaintiffs have shown a prima facie case of breach of contract, and the Defendants have not shown that the Agreement is unenforceable for lack of material terms, or that it is not sufficiently definite, summary judgment is denied on count I, breach of contract.

---

[7] The Defendants make much of the Plaintiffs' deposition testimony that references the term "indefinite." On a review of the record, in the light most favorable to the Plaintiffs, the Defendants take this out of context. The Plaintiffs did not state that they would have use and possession of the Vessel forever, or even for many years, without paying the Defendants. Instead, their understanding of the Agreement was that they would have use and possession of the Vessel until they paid the Defendants what was owed, and then they would take title to the Vessel.

## B. Count II: Fraudulent Misrepresentation

The five elements that a plaintiff must show to sustain claim for fraudulent misrepresentation are that a defendant made

> (1) a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*Cianchette v. Cianchette*, 2019 ME 87, ¶ 20, ___A.3d___ quoting (*Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, ¶ 17, 147 A.3d 824) (ellipses omitted).

The Defendants argue that the Plaintiffs do not show that their statements were false when they were made. They point out that they took back the Vessel only after three weeks went by with no seaweed harvested, and no communication from the Plaintiffs about future harvesting, to show that the Defendants' intent not to perform under the Agreement arose <u>after</u> the Agreement was made, not at the time it was made. *See Cianchette*, 2019 ME 87, ¶ 26, ___ A.3d ___ (explaining that "[w]here the intent not to perform arises at some point *after* the contract is entered into, then the appropriate remedy lies solely in an action for breach of contract."). In short, the Defendants maintain that the Defendants decided not to perform under the Agreement only after the heated disagreement, the lack of seaweed, and the lack of communication.

For their part, the Plaintiffs agree that there was a heated disagreement regarding where to harvest seaweed from, and, as a result, Gregory never spoke to Morse again. However, they point to Angela's multiple contacts with Morse, as evidenced in her affidavit, to show her attempts to obtain a payoff price for the Vessel. Angela never received a payoff price, and after they took the Vessel out of the water to change its oil, presumably to resume harvesting, an ALI employee took the Vessel back. Viewing this evidence in the light most favorable to the Plaintiffs, a reasonable jury could find that the

13

Defendants failed to provide a payoff price because they never intended to follow through with the Agreement, thus making their statements false at the time they were made.[8] The court denies the Defendants' motion for summary judgment on count II, fraudulent misrepresentation.[9]

### C. Should Defendant Morse be Granted Summary Judgment in His Individual Capacity?

The Plaintiffs seek to hold Morse individually liable on their claims primarily because of their assumption that he is the owner of ALI. In essence, from their deposition testimony, they believe that when they spoke with Morse to craft the Agreement, they were contracting with both Morse and ALI, solely because of their belief that Morse owns ALI.[10] They also argue that he was the only Defendant involved in the conversations leading up to the Agreement, and, after it fell apart, he was the person that told them he would get them a payoff amount. They contend that, based on this, a reasonable jury could conclude that Morse obligated himself individually.

The Defendants maintain that everything surrounding the Agreement supports the conclusion that it was between ALI and the Plaintiffs, and that Morse was not

---

[8] This is a reasonable inference which a factfinder could make based on the evidence cited in the summary judgment record.

[9] The Plaintiffs have shown a prima facie case of the other elements of fraudulent misrepresentation. Whether they could ultimately take title to the Vessel is a material fact, the Plaintiffs were induced to build the boat and harvest seaweed, their reliance is justifiable under the circumstances, and they show damages by Gregory working at a reduced boat-building rate, or because it would cost them substantially more to buy a different boat of similar quality.

[10] In his deposition testimony, Gregory explained how he sees the deal between himself and the Defendants: "I consider it like me and Perry's Pride. I talk to Bob which I think is Atlantic Labs because he owns it." G. Lawson Dep. 27:21-22. When asked if he understood if there was any distinction between himself and Perry's Pride, Gregory answered "No, I don't. I think I am Perry's Pride." G. Lawson Dep. 28:8. Angela's deposition testimony reflects the same views.

14

involved individually. The Agreement was negotiated in ALI's office, ALI paid for the Vessel's hull, the Vessel was registered to ALI, and the Plaintiffs sold their seaweed to, and were paid by, ALI. Morse was not involved individually in any of these happenings. They maintain that the Plaintiffs have not shown any legal duties owed to or from Morse, and therefore, summary judgment should be entered for him on both counts.

The court agrees that the Plaintiffs have not met their burden to show that Morse was individually obligated by, or liable for, the Agreement. The Plaintiffs have admitted DSMF ¶ 56, that they sued Morse individually because is employed by ALI and that they assume he is the owner, but they do not actually know if ALI or Morse is the proper Defendant or counterparty. The Plaintiffs objected to DSMF ¶ 57, which asserts that Morse has no individual performance obligations under the Agreement, and therefore cannot be held liable in relation thereto, because "it is a legal assertion." However, they do not provide a denial,[11] let alone an alternative interpretation, and therefore this fact is admitted. The only evidence the Plaintiffs offer to support that Morse contracted with them individually, as opposed to his capacity as ALI, is their lack of knowledge that a corporation has the capacity to contract on its own, without a person also contracting individually. This is not enough. The Law Court has explicitly stated that "[w]hen there is so little evidence tending to show a critical element of a plaintiff's claim that the jury would have to speculate in order to return a verdict for the plaintiff, a defendant is entitled to a summary judgment." *Beaulieu v. Aube Corp.*, 2002 ME 79, ¶ 31, 796 A.2d 683.

---

[11] M.R. Civ. P. 56(h)(4) provides that facts contained in a supporting or opposing SMF are deemed admitted unless properly controverted. "When a party moves for summary judgment, the opposing party must explicitly admit, deny, or qualify facts . . . and a denial or qualification must be supported by a record citation. If the nonmoving party does not properly controvert those statements of fact, all facts as set out by the moving party are deemed admitted . . . ." *Halliday v. Henry*, 2015 ME 61, ¶ 7, 116 A.3d 1270 (alterations, citations, and quotation marks omitted).

Because the Plaintiffs have not met their burden to show a prima facie case that Morse made the Agreement in his individual capacity, the court grants him summary judgment on both counts.

## II. Summary Judgment on the Plaintiffs' Failure to Comply with Rule 56

The Defendants argue that because the Plaintiffs did not strictly comply with M.R. Civ. P. 56 that they are entitled to summary judgment. Although the Plaintiffs responded to each of the Defendants' SMFs, they failed to offer their own opposing or additional material facts supported by record citations in a separate document. Instead, they offered Angela Lawson's affidavit, and cited to that, along with portions of the Plaintiffs' depositions, in their memorandum of law opposing summary judgment. The Defendants contend that this procedural defect alone should win them summary judgment.

M.R. Civ. P. 56(h)(1) requires that a motion for summary judgment "be supported by a separate, short, and concise statement of material facts . . ." The opposing party "shall submit with its opposition a separate, short, and concise opposing statement," which admits, denies, or qualifies the moving party's material facts. M.R. Civ. P. 56(h)(2). "The opposing statement may contain in a separately titled section any additional facts which the party opposing summary judgment contends raise a disputed issue for trial, set forth in separate numbered paragraphs and supported by record citation as required by paragraph (4) of this rule." *Id.* If facts in a supporting or opposing statement, which correctly cite the record, are not properly controverted, they are deemed admitted. M.R. Civ. P. 56(h)(4). Assertions of fact must be supported by a proper record cite to the specific page or paragraph of the record. *Id.* Otherwise, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Moreover, "[t]he court shall have no independent duty to search

16

or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

The Defendant cites to *Cach, LLC v. Kulas*, a foreclosure case, for the proposition that this court "should consider *only* the portions of the record referred to" in the Rule 56(h) statements and is "neither *required nor permitted* to independently search a record to find support for facts offered by a party." 2011 ME 70, ¶ 10 n.3, 21 A.3d 1015 (quotations omitted) (citing *Deutsche Bank Nat'l Trust Co. v. Raggiani*, 2009 ME 120, ¶ 7, 985 A.2d 1). In *Cach*, the opposing party filed an "Objection to Summary Judgment" which did not comply with M.R. Civ. P. 56(h)(2), or include a statement of material facts opposing the motion, "but instead consisted of his arguments regarding why Cach's motion was inadequate." *Id.* In discussing summary judgment practice, the Law Court explained that

> a party who moves for a summary judgment must properly put the motion and, most importantly, the material facts before the court, or the motion will not be granted, regardless of the adequacy, or inadequacy, of the nonmoving party's response. Thus, although [the opposing party's] responsive filings were inadequate, this fact alone does not end the inquiry. As the moving party with the ultimate burden of proof, Cach bears the initial responsibility of demonstrating the absence of a genuine issue of material fact through a properly supported statement of material facts.

*Id.* ¶ 9 (alterations, quotations, and citations omitted). The Court then went on to address why the moving party's record did not adequately support its motion for summary judgment. Without record references, an offered material fact is not properly before the court. *Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 9, 770 A.2d 653. The Court has stated that "[i]n the unique setting of summary judgment, strict adherence to the Rule's requirements is necessary to ensure that the process is both predictable and just." *Deutsche Bank*, 2009 ME 120, ¶ 7, 985 A.2d 1. In *Deutsche Bank*, the trial court improperly considered evidence outside the summary judgment record when, after all the motions

17

and the record were submitted, it held a hearing on summary judgment, and admitted additional evidence from the bank. *Id.* ¶¶ 1, 3-4.

The Defendant is correct that the Plaintiffs did not technically comply with the letter of M.R. Civ. P. 56. However, because they provided record citations to specific paragraphs of Angela's affidavit, and record citations to specific pages of their depositions, they have complied with the spirit of Rule 56. This court did not have to undertake an independent search of the record. The Plaintiffs answered the Defendants' SMFs as required by Rule 56(h)(2). Although the Law Court has stated that the parties must follow the proper procedure, which the Plaintiffs only partially did here, it is clear that the Law Court is more concerned that this court does not have to undertake an independent search of the record. Summary judgment is denied on the basis of the Plaintiffs' partial failure to comply with M.R. Civ. P. 56.

## CONCLUSION

The Defendants' Motion for Summary Judgment is granted for Morse in his individual capacity on both counts. The motion is denied in all other aspects.

The Clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: July 29, 2019

Daniel I. Billings, Justice
Maine Superior Court

18